UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,        Court File No. 18-cr-282 (ADM/LIB)

      Plaintiff,

v.        **REPORT AND RECOMMENDATION**

Adrian Joseph Valdez,

      Defendant.

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon Defendant Adrian J. Valdez's (hereinafter "Defendant") Motion to Suppress Statements, Admissions, and Answers, [Docket No. 31], and upon Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure. [Docket No. 32]. The Court held a motions hearing on January 15, 2019, regarding the parties' pretrial motions.[1] At the motions hearing, the Court took Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 31], and Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 32], under advisement.

For the reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 31], be **DENIED**, and that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 32], be **DENIED**.

---

[1] The Court addressed the parties' pretrial motions for discovery and production of evidence by separate Order. [Docket No. 42].

## I.    BACKGROUND AND STATEMENT OF FACTS

### A.  Background

Defendant is charged with two counts of assault with a dangerous weapon, in violation of 18 U.S.C. §§ 113(a)(3), 113(a)(6), 1151, and 1153(a); and two counts of assault resulting in serious bodily injury, in violation of 18 U.S.C. §§ 113(a)(3), 113(a)(6), 1151, and 1153(a). (Indictment [Docket No. 16]).

### B.  Facts

The record presently before the Court indicates that on August 10, 2018, Sergeant Kendall Kingbird (hereinafter "Sgt. Kingbird") of the Red Lake Police Department was dispatched to Avis Laduke's residence (hereinafter "Laduke Residence") after a "911" call reporting that there had been a stabbing at the residence. (January 15, 2019, Motions Hearing, Digital Recording at 11:23–11:25 a.m.).

Sgt. Kingbird was the first law enforcement officer to arrive at the Laduke Residence (Id.). As he pulled his patrol vehicle into the driveway of the Laduke Residence, Sgt. Kingbird observed Defendant walking down the middle of the driveway towards him, in the direction of the roadway. (Id. at 11:27–11:29 a.m.). He also observed Defendant put his hands up and drop the beer he was holding in his hand. (Id. at 11:27–11:28 a.m.). As Sgt. Kingbird was parking his patrol vehicle, he observed Defendant drop to his knees and put his hands behind his back. (Id.). Sgt. Kingbird then parked his patrol vehicle in the Laduke Residence driveway, approximately 100 yards away from the house. (Id.). Sgt. Kingbird could not clearly see the Laduke Residence or the porch of the residence from where he parked. (Id.).

After parking, Sgt. Kingbird exited his vehicle and approached Defendant. (Id. at 11:28–11:29 a.m.). Sgt. Kingbird testified that, while approaching Defendant, he observed that Defendant

had blood on his hand. (Id.). Upon seeing the blood on Defendant's hand, Sgt. Kingbird asked Defendant if he was injured, to which Defendant responded, "no." (Id.). When Sgt. Kingbird walked up to Defendant, without any instructions from Sgt. Kingbird, Defendant laid down and put his hands behind his back. (Id. at 11:29–11:30 a.m.). Defendant then stated, "I stabbed them take me to jail." (Id. at 11:30–11:31 a.m.).

After hearing Defendant state that he "stabbed them," Sgt. Kingbird put Defendant in handcuffs and read Defendant a Miranda[2] warning. (Id.). Sgt. Kingbird asked Defendant what his name was, but at no time thereafter did Sgt. Kingbird ask Defendant any further questions. (Id.). Sgt. Kingbird observed that Defendant appeared angry, but he reportedly did not have any trouble putting handcuffs on Defendant. (Id.). After reading Defendant his Miranda rights, Sgt. Kingbird helped Defendant stand up and they waited in front of Sgt. Kingbird's patrol vehicle for approximately 15 minutes for a transport unit to arrive. (Id. at 11:33–11:34 a.m.).

While waiting for a transport unit to take Defendant, Sgt. Kingbird observed an ambulance arrive, proceed to the residence, and subsequently leave the scene with an apparent stabbing victim. (Id.). Afterwards, someone from the Laduke Residence walked down the driveway and made threats toward Defendant. (Id.). Sgt. Kingbird advised the person to return to the Laduke Residence. (Id.).

A few minutes after that encounter, another vehicle drove up the driveway and parked behind Sgt. Kingbird's vehicle. (Id.). Two people who identified themselves as relatives of one of the stabbing victims exited the vehicle and made threats to Defendant while walking up the driveway towards the house. (Id. at 11:34–11:35 a.m.). Defendant began yelling back at the

---

[2] Miranda v. Arizona, 384 U.S. 436, 444 (1966).

individuals who had yelled at him, and he again told Sgt. Kingbird to take him to jail. (Id. at 11:35–11:36 a.m.).

Defendant then pushed himself off of the front of Sgt. Kingbird's patrol vehicle causing Sgt. Kingbird to put Defendant to the ground. (Id.). Sgt. Kingbird told Defendant that he would tase Defendant if he didn't settle down to which Defendant responded that Sgt. Kingbird should go ahead and tase him because he had been tased before. (Id.). Defendant also told Sgt. Kingbird that the people yelling at him wanted to "start shit with him," and he again told Sgt. Kingbird that he "stabbed them." (Id.).

Thereafter, the transportation unit arrived, and Defendant was transported to the Red Lake Detention Center. (Id. at 11:36–11:37 a.m.).

After Defendant was transported to the Red Lake Detention Center, Sgt. Kingbird walked up the driveway to the Laduke Residence. (Id. at 11:39–11:40 a.m.). When he arrived at the house, Sgt. Kingbird observed that there were blood smears on the porch of the Laduke Residence, as well as, lawn furniture and beer cans. (Id. at 11:40–11:41 a.m.). He also observed that there was blood on the ground surrounding the porch. (Id.). Sgt. Kingbird knocked on the door of the Laduke Residence, but no one answered. (Id.).

Sgt. Kingbird then waited approximately one hour for other officers to arrive. (Id. at 11:41–11:42 a.m.). While Sgt. Kingbird was waiting for the other officers to arrive, he took pictures of the porch of the Laduke Residence, which had beer cans, blood, and lawn chairs on it. (Id. at 12:06–12:07 p.m.). At one point while Sgt. Kingbird was waiting for other officers to arrive, Avis Laduke, the owner of the home, came outside of the Laduke Residence. (Id. at 11:41–11:42 a.m.). While Avis Laduke was outside, Sgt. Kingbird briefly talked to her, and he thought she might be intoxicated because of her slurred speech and because she smelled of alcohol. (Id.). During their

brief discussion, Avis Laduke told Sgt. Kingbird that her son and her nephew had been stabbed, and she said that her son was still inside the Laduke Residence. (Id. at 11:43–11:44 a.m.). Sgt. Kingbird asked Avis Laduke if he could check on her son and she told him no. (Id.).

Thereafter, Criminal Investigator Geoff Pierre (hereinafter "CI Pierre") of the Red Lake Tribal Police Department arrived at the Laduke Residence. (Id. at 11:45–11:46 a.m.; 12:15–12:16 p.m.). Sgt. Kingbird walked back down the driveway to talk with CI Pierre and inform him of his conversation with Avis Laduke—specifically that Avis Laduke had told him that her son was injured and still inside the Laduke Residence. (Id.). The officers then walked back up the driveway to the Laduke Residence. (Id.). When the officers got back to the Laduke Residence, Avis Laduke was standing on the porch, and she let them into her home to check on her son, Robert McGregor. (Id.).

After locating Robert McGregor inside the Laduke Residence, the officers requested another ambulance for Robert McGregor to transport him to a hospital. (Id. at 11:47–11:48 a.m.). The officers also had everyone else then in the house—approximately six people—gather in the living room so they could make sure no one else was injured. (Id.). While the officers were inside the Laduke Residence, they did not look through any drawers, closets, paperwork, or take anything from the inside of the Laduke Residence. (Id. at 12:24–12:25 p.m.).

Shortly after everyone gathered in the living room, and after an ambulance had transported Robert McGregor from the scene, Special Agent Mark Meyers (hereinafter "SA Meyers") of the Federal Bureau of Investigation, Bemidji Resident Agency, arrived at the Laduke Residence. (Id. at 12:45–12:46 p.m.). When he arrived, he began to "process the crime scene," which included photographing the outside of the Laduke Residence—primarily the porch—as well as, searching outside of the residence for the knife used in the stabbing. (Id. at 12:46–12:47 p.m.). After the

officers began processing the scene outside of the Laduke Residence, they did not go back inside the residence. (Id.). Avis Laduke was with the officers the entire time they were outside of her home processing the crime scene, and she did not object to the officers' photographing the outside of the Laduke Residence or searching for a knife. (Id.). While the officers were outside of the Laduke Residence, Andrea Laduke, Avis Laduke's daughter, without being told to do so brought the officers Robert McGregor's shirt that he had been wearing when he was stabbed. (Id. at 12:24–12:25 p.m.). Also, while processing the exterior crime scene, the officers took a shirt sitting on the porch with them, which they believed belonged to Joshua Laduke, the individual who was the first person to have been transported to a hospital. (Id. at 12:23–12:24 p.m.). Avis Laduke did not object to the officers taking the shirt from the porch. (Id.).

On August 15, 2018, at approximately 11:08 a.m., SA Meyers interviewed Defendant in a conference room at the Red Lake Police Department, which was attached to the Red Lake Detention Center where Defendant had been held since his arrest on August 10, 2018. (Id. at 12:47–12:48 p.m.).

Before the interview began, SA Meyers contacted jail control to bring Defendant to the conference room. (Id. at 12:48–12:49 p.m.). SA Meyers testified that when Defendant arrived, he was wearing shackles; however, SA Meyers removed the shackles before asking Defendant any questions. (Id.).

SA Meyers testified that the conference room had two doors, both of which were closed but unlocked, one wall with windows, one wall with a white board, as well as, a conference table with chairs surrounding it. (Id. at 12:49–12:50 p.m.). SA Meyers further testified that when the interview started, he was alone with Defendant, but shortly after the interview began, Criminal

Investigator Ron Leyba (hereinafter "CI Leyba") came into the conference room. (Id. at 12:50–12:51 p.m.; Gov't Ex. 2 0:30–1:00).[3]

At the beginning of the interview, the officers introduced themselves. (Gov't Ex. 2 0:30–2:00). The officers asked Defendant about his current phone number and address. (Id. at 2:00–4:00). Defendant answered each question appropriately. (Id.).

Next, using an Advice of Rights form, SA Meyers read Defendant a Miranda warning. (Id. at 2:00–4:00). Afterwards, SA Meyers asked Defendant to read aloud the consent statement also contained on the Advice of Rights form, and Defendant did so. (Id. at 3:20–3:40; Gov't Ex. 1). SA Meyers asked Defendant if he understood the consent form and Defendant responded, "Yeah I don't have nothing to hide." (Id. at 5:30–6:00). Defendant then signed the Advice of Rights form, and the form was witnessed by SA Meyers. (Id.).[4]

The officers next began asking Defendant about the events that occurred on August 10, 2018. (Id. at 6:00–6:30). Defendant began by explaining how he had come to Minnesota from Arizona, (Id. at 6:30–7:30), when he asked the officers if he could wash his face. (Id. at 8:45–9:45). The officers obliged and gave Defendant a wet towel to clean off his face and gave him a dry towel to dry his face and his hands. (Id.).

Defendant next discussed the type and quantity of the alcoholic beverages he claimed he had consumed the night of August 10, 2018. (Id. at 10:45–12:00). Defendant then explained that he remembered "tussling around" with someone and that another person told him to leave the Laduke Residence. (Id. at 12:00–13:00). He also recalled hearing someone yell at him that he cut

---

[3] Government's Exhibits 2 is a copy of the audio recording of Defendant's August 15, 2018, interview. At the Motions Hearing, the Government, without objection, offered the audio recording into evidence as Government's Exhibit 2. (January 15, 2019, Motions Hearing, Digital Recording at 12:50–12:51 p.m.).

[4] Government's Exhibits 1 is a copy of the Advice of Rights form signed by Defendant. At the Motions Hearing, the Government, without objection, offered the form into evidence as Government's Exhibit 1. (January 15, 2019, Motions Hearing, Digital Recording at 12:50–12:51 p.m.).

someone and that he simultaneously saw a police vehicle pulling up the driveway of the Laduke Residence. (Id.). Although he could not remember where he threw his knife, Defendant recalled throwing it as he left the Laduke Residence. (Id. at 21:00–21:45). Defendant explained that the knife he used belonged to him and was a chrome, Winchester folding pocket knife with a small blade. (Id.).

Defendant continued to describe the events that occurred on the night of August 10, 2018, and expressed that he felt bad about his actions because "Robert is a peaceful guy." (Id. at 22:00–23:00). Defendant went on to say, "I'll take full responsibility for what I did because these people don't deserve to be hurt like that." (Id. at 23:00–23:30). Defendant continued to discuss how upset he was and stated, "I feel I let a lot of people down." (Id. at 25:00–27:30). He further stated that he was "really glad no one died." (Id. at 28:30–29:00).

The recording ended at approximately 11:41 a.m. on August 15, 2018. (Id. at 33:00–34:00). Once the interview was completed, SA Meyers collected Defendant's fingerprints and opened the door to the conference room where Defendant was escorted back to his holding cell by jail control staff. (January 15, 2019, Motions Hearing, Digital Recording at 12:56–12:58 p.m.).

Throughout the August 15, 2018, interview, the officers maintained a conversational tone and made no threats or promises to Defendant. Although Defendant became somewhat emotional at times, Defendant also maintained a conversational tone. He was cooperative throughout the interview and showed a willingness to cooperate with the officers. Defendant also responded appropriately to the questions presented. In total, Defendant's interview lasted for only a little more than thirty (30) minutes.

## II.   DEFENDANT'S MOTION TO SUPPRESS STATEMENTS, ADMISSIONS, AND ANSWERS. [DOCKET NO. 31].

Defendant argues that the statements he made on both August 10, 2018, and August 15, 2018, should be suppressed. (Def. Mot., [Docket No. 31], at 2). Regarding his statements on August 10, 2018, Defendant argues only that those statements should be suppressed because he claims he was intoxicated. (Id.). Regarding his August 15, 2018, statements, Defendant argues that those statements should be suppressed because the statements were not the product of a voluntary, knowing, and intelligent waiver of his Miranda rights. (Id.).

### A.  Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of [his] [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of [her] freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). "Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (quoting Rhode Island v. Innis, 466 U.S. 291, 300–01 (1980)).

A defendant is entitled to a Miranda warning prior to custodial interrogation. Miranda, 384 U.S. at 444–45. Interrogation for Miranda purposes includes "any questioning or conduct that the government officer should know is reasonably likely to elicit an incriminating response." United

States v. McLaughlin, 777 F.2d 388, 390 (8th Cir. 1985). Whether an incriminating response is sought by an officer is determined "from the perspective of the suspect" and not by the officer's actual intent. United States v. Richardson, 427 F.3d 1128, 1132 (8th Cir. 2005).

A defendant may waive his Miranda rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

### B. Analysis

#### i. August 10, 2018, Statements

Defendant first moves to suppress statements he made to Sgt. Kingbird on August 10, 2018, in the driveway at the Laduke Residence. (Def.'s Mot., [Docket No. 31], at 1). As set forth above, he argues only that the statements were involuntary because he now claims he was severely intoxicated when he made the statements. (Id. at 2).

As noted above, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury, 511 U.S. at 322 (quoting Miranda, 384 U.S. at 444). To be subject to suppression under Miranda, a statement must be made while in custody and in response to interrogation. United States v. McGlothen, 556 F.3d 698, 701 (8th Cir. 2009) (citing United States v. Londondio, 420 F.3d 777, 783 (8th Cir. 2005)).

Thus, a statement that is voluntary and is "not the product of police questioning or police action likely to produce an incriminating response" is admissible. Richardson, 427 F.3d at 1132; See also, United States v. McCoy, 200 F.3d 582, 584 (8th Cir. 2000) (statements that are spontaneous and voluntary do not require suppression). Accordingly, Miranda warnings are only required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way," Stansbury v. California, 511 U.S. 318,

322 (1994) (quoting <u>Miranda</u>, 384 U.S. at 444); however "[i]nterrogation under <u>Miranda</u> includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>United States v. Hull</u>, 419 F.3d 762, 767 (8th Cir. 2005) (quoting <u>Rhode Island v. Innis</u>, 466 U.S. 291, 300–01 (1980)). Accordingly, "<u>Miranda</u> has no application to statements . . . that are voluntarily offered and not a product of either express questioning or any police practice reasonably likely to evoke an incriminating response." <u>United States v. Griffin</u>, 922 F.2d 1343, 1357 (8th Cir. 1990) (citations omitted). "<u>Miranda</u> does not protect an accused from a spontaneous admission made under circumstance not induced by the investigating officers or during a conversation not initiated by the officers." <u>United States v. Hayes</u>, 120 F.3d 739, 744 (8th Cir. 1997) (quoting <u>United States v. Hawkins</u>, 102 F.3d 973, 975 (8th Cir. 1996), cert. denied, 520 U.S. 1179 (1997)).

Thus, in the present case, the threshold issue is whether Defendant was subject to custodial interrogation for the purposes of <u>Miranda</u> on August 10, 2018. The Court finds that Defendant was not subject to an interrogation and that his statements made to Sgt. Kingbird on August 10, 2018, were entirely spontaneous. <u>See</u>, <u>United States v. Travis</u>, No. 14-cr-253 (DSD/SER), 2015 WL 439393, at *22 (D. Minn. Feb. 3, 2015) (finding that where the defendant was not asked any questions by law enforcement the defendant was not subject to an interrogation and made spontaneous statements).

In the present case, Sgt. Kingbird testified that after getting Defendant's name he did not ask Defendant any further questions to prompt any of Defendant's statements. There is nothing in the record to contradict Sgt. Kingbird's testimony in this regard. The record shows that Sgt.

Kingbird had merely just arrived at the Laduke Residence and, upon getting out of his patrol vehicle, Defendant immediately, without any prompting confessed to stabbing multiple people.

Notably, Sgt. Kingbird's arrival at the Laduke Residence "was not accompanied by any threats or other coercive pressures," and thus his conduct during the encounter with Defendant was not designed to illicit any incriminating response from Defendant. United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005). Because Sgt. Kingbird did not ask Defendant any questions, nor did he apply any coercive pressures, Defendant was not interrogated for purposes of Miranda. See, Hawkins, 102 F.3d at 975 (holding that Miranda does not bar the government from introducing into evidence spontaneous statements made during a conversation). Even after Defendant was arrested and read his Miranda rights, he continued to make various spontaneous statements to Sgt. Kingbird.

Therefore, because Defendant voluntarily offered the statements to Sgt. Kingbird without any words or actions by Sgt. Kingbird which were reasonably likely to elicit an incriminating response from Defendant, those statements to Sgt. Kingbird were spontaneous. See, United States v. Edwards, 563 F. Supp. 2d 977, 998 (D. Minn. 2008) (holding that the defendant's statements were spontaneous where the officer had not yet spoken to the defendant at the time the defendant made incriminating statements); United States v. Turner, 157 F.3d 552, 556 (8th Cir. 1998) ("We have repeatedly held that '[a] voluntary statement made by a suspect, not in response to interrogation, is not barred . . . and is admissible with or without the giving of Miranda warnings.'") (alteration in original); See, United States v. Barnes, 195 F.3d 1027, 1029 (8th Cir. 1999) (finding spontaneous a defendant's statement that the officer was incorrect after he had advised defendant he was going to be booked for possession of a firearm because the statement was in response to a statement of fact not the functional equivalent of interrogation).

Defendant argues that his statements made to Sgt. Kingbird on August 10, 2018, were involuntary nonetheless because he claims he was in a severely intoxicated state. (Def.'s Mot., [Docket No. 31], at 1–2). This argument, however, is without merit for at least two reasons.

First, the Eighth Circuit has repeatedly made it clear that the mere fact that a defendant was under the influence of a controlled substance, including alcohol, does not per se render his statements involuntary. See, e.g., United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) ("We have repeatedly declined to adopt a per se rule of involuntariness when confronted with intoxication and/or fatigue, and we decline to do so now.") (citing United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990)). Cf. United States v. Goodwin, No. 00-2750, 2000 WL 1852624, at *1 (8th Cir. Dec. 19, 2000) ("We have declined to adopt a per se rule that a Miranda waiver made under the influence of drugs is involuntary.") (unpublished).

Rather, when considering the issue of voluntariness, the Court must look at the totality of the circumstances to determine whether a defendant's intoxication caused their will to be overborne. United States v. Howard, 532 F.3d 755, 763 (8th Cir. 2008); See also, e.g., United States v. Korn, 138 F.3d 1239, 1240 (8th Cir. 1998) (holding that under the totality of the circumstances, the fact defendant was under the influence of drugs and was exhausted when he made incriminating statements did not render them involuntary); United States v. Byrne, 83 F.3d 984, 989 (8th Cir. 1996) (affirming district court's finding that statement was not involuntary although defendant was under the influence of a narcotic (methadone) at the time); United States v. Casal, 915 F.2d 1225, 1229 (8th Cir. 1990) (coherent confession not involuntary even though defendant had recently used methamphetamine and had not slept for five days). Other Circuit Courts of Appeal have similarly reached the same conclusion. See, e.g., Parsad v. Greiner, 337 F.3d 175, 184 (2d Cir. 2003) ("The mere fact that petitioner is an alcoholic is insufficient to render

his statements involuntary."); United States v. Brooks, 125 F.3d 484, 491 (7th Cir. 1997) (finding that statement was voluntary despite claim that suspect was experiencing effects of crack cocaine, sleep deprivation, and a hand injury because defendant was alert, coherent, and able to make informed and voluntary choices).

In United States v. Turner, 157 F.3d 552, 556 (8th Cir. 1998), the Eighth Circuit found that although the defendant was under the influence of the drug PCP, his behavior showed that, at the time of his confession, he had the mental capacity to voluntarily waive his rights. Id. The Court in Turner relied on the fact that the defendant was cooperative, reviewed and initialed a waiver form, responded to questions, and gave accurate information in finding that he had sufficient mental capacity to waive his rights. Id.

In the present case, while Defendant has asserted in his Motion that his statements were involuntary because he "was in a severely intoxicated state," at the motions hearing, Sgt. Kingbird offered unrebutted testimony that, at the time Defendant made his August 10, 2018, spontaneous statements, he did not appear intoxicated. Aside from holding a single can of beer, there was nothing observed by Sgt. Kingbird to suggest that Defendant was intoxicated or that Sgt. Kingbird was actually aware that Defendant was intoxicated at the time he made his August 10, 2018, statements. Thus, at the time Defendant made his spontaneous statements to Sgt. Kingbird, there was nothing under the totality of the circumstances then indicating to Sgt. Kingbird that Defendant was intoxicated. Rather, it was only later at his August 15, 2018, interview did Defendant claim to SA Meyers that he was severely intoxicated on the night of August 10, 2018. (Gov't Ex. 2 10:45–12:00).

Moreover, even assuming Defendant was intoxicated during his interaction with Sgt. Kingbird, this does not automatically render his statements involuntary. When considering

voluntariness, "[t]he standard is whether, by reason of intoxication or other factor, defendant's 'will was overborne' or whether his statements were the 'product of a rational intellect and a free will.'" United States v. Brown, 535 F.2d 424, 427 (8th Cir. 1976) (internal citations omitted).

In United States v. Bedeau, No. 07-cr-299 (DSD/RLE), 2007 WL 4287680, at *4 (D. Minn. Dec. 4, 2007), the Court held that the defendant's statements were voluntary even though evidence showed that the defendant was clearly intoxicated. Specifically, the officer testified that the defendant smelled strongly of alcohol and was slurring her speech. Id. The Court, however, found that even though the defendant was intoxicated, she was able to comprehend the nature of her exchange with the officer because she engaged in conversation with the officer, asked for her attorney, and declined to sign a consent form. Id. at *11. Thus, because there was evidence that the defendant was able to comprehend the nature of her interaction with the officer, and therefore evidence that her will was not overborne, the Court found that the defendant's statements were voluntary despite her intoxication. Id.

Here, Defendant's assumed intoxication did not cause his will to be overborne on August 10, 2018. The circumstances of the present case demonstrate even less evidence than was present in Bedeau. Unlike the defendant in Bedeau, there is no evidence in the present case that Defendant was slurring his words or that he smelled of alcohol thus suggesting that he was intoxicated. Defendant was able to engage in conversation with Sgt. Kingbrid, recognize his potential culpability, and follow Sgt. Kingbird's directions. Specifically, when Sgt. Kingbird arrived, without Sgt. Kingbird giving any command whatsoever, Defendant surrendered himself and asked multiple times to be taken to jail. Defendant, on his own volition, put his hands up and got down on his knees. He then laid down on the ground and put his hands behind his back and confessed to an apparent crime. Furthermore, after receiving a warning at one point from Sgt. Kingbird that he

would have to tase him if he didn't settle down, Defendant indicated that it didn't matter to him as he had been tased before. Defendant's actions and responses show that he was aware of the situation going on around him and physically in control of himself under the circumstances. When considered individually or in concert, these actions show a high level of cooperation from Defendant and show that Defendant had the requisite mental capacity to comprehend the nature of the situation he found himself in on the night of August 10, 2018.

Thus, even assuming solely for the sake of argument that Defendant was intoxicated, considering the totality of the circumstances, the Court concludes that the record now before the Court fails to demonstrate that on the night of August 10, 2018, Defendant's will was overborne by his later self–purported level of intoxication. See, United States v. Laroche, No. CR. 08-30056-01-KES, 2008 WL 4224782, at *2 (D.S.D. Sept. 9, 2008) (finding that the defendant's will was not overborne where the defendant was slurring his words and seemed intoxicated because he was still able to follow the officer's instructions).

Finally, in any event, despite Defendant's argument to the contrary, Defendant's claimed intoxication does not affect whether his statements were, in fact, spontaneous. Rather, a statement is spontaneous as long as the statement was not the product of either express questioning or any police practice reasonably likely to evoke an incriminating response. See, Griffin, 922 F.2d at 1357 ("Miranda has no application to statements . . . that are voluntarily offered and not a product of either express questioning or any police practice reasonably likely to evoke an incriminating response.").

Defendant fails to provide, and this Court does not find, any case where a spontaneous statement was found to be involuntary due to a defendant's level of intoxication. Instead, the caselaw discussing the circumstances in which a defendant's level of intoxication could possibly

16

affect the issues of voluntariness is in reference to cases in which the defendant was subject to custodial interrogation and asked to waive his or her rights pursuant to <u>Miranda</u> and did so.

For example, in the sole case cited by Defendant to support his intoxication argument, <u>United States v. Annis</u>, 446 F.3d 852, 856 (8th Cir. 2006), the defendant was read his <u>Miranda</u> rights, waived his rights pursuant to <u>Miranda</u>, and then proceeded to make statements to the officers. The defendant later moved to suppress the statements on the ground that his <u>Miranda</u> waiver was involuntary because he was going through "meth withdrawal." <u>Id.</u> The <u>Annis</u> Court, however, held that the defendant's will was not overborne by the officer's tactics and therefore, the defendant's statements were voluntary. <u>Id.</u> Notably, <u>Annis</u> did not involve a spontaneous statement while under the influence of any controlled substance; rather, it only involved a defendant's affirmative waiver of <u>Miranda</u> rights. <u>Id.</u>

Therefore, because this Court has found that all of Defendant's statements on August 10, 2018, were spontaneous, Defendant's <u>Miranda</u> rights did not attach to any of Defendant's statements. Thus, because Defendant's <u>Miranda</u> rights did not apply to Defendant's spontaneous statements, there were no <u>Miranda</u> rights for Defendant to voluntarily waive. <u>See</u>, <u>e.g.</u>, <u>United States v. Jones</u>, 842 F.3d 1077, 1083 (8th Cir. 2016) (finding that the defendant's statement was spontaneous and not taking into consideration that the fact that defendant was intoxicated).

Based on the foregoing, the Court recommends **DENYING** Defendant's Motion to Suppress Statements, Admission, and Answers, [Docket No. 31], to the extent the motion pertains to the statements Defendant made on August 10, 2018.

### ii.    August 15, 2018, Statements

Defendant next moves the Court for an Order suppressing the statements he made during the interview on August 15, 2018. (Def.'s Mot., [Docket No. 31], at 2). Defendant argues that the

statements he made during that custodial interrogation should be suppressed because the waiver of his Miranda rights was not valid because of the length of his detention before this interrogation. (Id.).

As noted above, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury, 511 U.S. at 322 (quoting Miranda, 384 U.S. at 444). To be subject to suppression under Miranda, a statement must be made while in custody and in response to interrogation. McGlothen, 556 F.3d at 701 (citing Londondio, 420 F.3d at 783).

Here, it is undisputed that law enforcement's express questioning of Defendant on August 15, 2018, constituted interrogation. (January 15, 2019, Motions Hearing, Digital Recording at 12:50–12:51 p.m.). It is also undisputed that Defendant was in custody during the August 15, 2018, interview when he made the statements he now seeks to suppress. (Id.). The record also clearly demonstrates that Defendant was read a Miranda warning from an Advice of Rights form before the interrogation portion of the interview began, that he himself read the consent statement on that Advice of Rights form aloud, and that he signed the waived on the Advice of Rights form, as well as, gave a verbal confirmation that he understood the Advice of Rights form. (Gov't Ex. 2 at 4:15–4:30; Gov't Ex. 1).

Accordingly, the only issue now before the Court regarding Defendant's August 15, 2018, interview is whether the Government has demonstrated that the Defendant's waiver of his rights was made intelligently, knowingly, and voluntarily. See, gen., Miranda, 384 U.S. at 444, 475. The validity of a Miranda waiver requires consideration of two distinct inquiries, namely whether the waiver was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and whether the waiver was knowingly and

18

intelligently made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "The government has the burden of proving the validity of the Miranda waiver by a preponderance of the evidence." United States v. Haggard, 368 F.3d 1020, 1024 (8th Cir. 2004).

### 1. Voluntariness

Courts assess whether a waiver of rights pursuant to Miranda was made voluntarily by considering "the conduct of law enforcement officials and the suspect's capacity to resist any pressure." United States v. Contreras, 372 F.3d 974, 978 (8th Cir. 2004). The United States Supreme Court has previously explained "that coercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary,'" Colorado v. Connelly, 479 U.S. 157, 167 (1986), and the Eighth Circuit has read that holding to mean "that police coercion is a necessary prerequisite to a determination that a waiver was involuntary and not as bearing on the separate question whether the waiver was knowing and intelligent." United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (quoting United States v. Bradshaw, 935 F.2d 295, 299 (D.C. Cir. 1991)).

In determining whether a waiver was made voluntarily, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." United States v. Syslo, 303 F.3d 860, 866 (8th Cir. 2002). In considering the totality of the circumstances, a court reviews whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and [his] capacity for self-determination critically impaired." United States v. Sanchez, 614 F.3d 876, 883 (8th Cir. 2010) (internal quotation marks and citations omitted). "More specifically, [a court] consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's

maturity, education, physical condition, and mental condition." Id. (citing Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004)).

The Court's independent review of the audio recording of the interview indicates that in the present case the officers did not engage in any threatening or coercive tactics. See, United States v. Mims, 567 F. Supp. 2d 1059, 1080 (D. Minn. 2008) (holding Miranda waiver voluntary where, among other factors, interview was conducted in a reasonable, conversational tone); See also, United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (concluding no coercive tactics were used where, among other things, officers made no threats or promises to the defendant).

Additionally, the interview, which only lasted a little more than thirty (30) minutes, was not coercive in its duration. See, United States v. Mims, 567 F. Supp. 2d 1059, 1080 (D. Minn. 2008) (noting that interrogation lasting more than two hours was not coercive in duration).

Based on the foregoing, and under the totality of the circumstances, the Court concludes that Defendant's waiver of his rights during the custodial interrogation on August 15, 2018, was voluntary.

### 2. Knowing and Intelligent

Next, the Court must consider whether Defendant's waiver of his rights was knowingly and intelligently made. Vinton, 631 F.3d at 483. The evidence in the record regarding Defendant's understanding of his rights and presence of mind during the August 15, 2018, interview consists of the audio recording of the interview and the hearing testimony of SA Meyers.

Defendant argues that his statements from the interview should be suppressed because the waiver of his rights under Miranda was invalid because he was not fully aware of the nature of the rights he was abandoning. (Def.'s Mot., [Docket No. 31], at 2).

In the present case, the Government offers sufficient evidence for the Court to determine by a preponderance thereof that Defendant's waiver of his rights on August 15, 2018, was knowing and intelligent.

Considering the totality of the circumstances, the Court's independent review of the audio recording of the August 15, 2018, interview shows that Defendant appeared to fully comprehend the conversation, understood the situation, understood the questions being asked of him, and provided contextually appropriate answers. (Gov't Ex. 2 4:00–33:00). Defendant's understanding, comprehension, and independence of will under the circumstances was further demonstrated when he told the officers he wanted to take responsibility for his actions. (Id. at 23:00–24:00). The audio recording, further, provides that SA Meyers read aloud to Defendant a Miranda warning from an Advice of Rights form, and after Defendant himself read aloud the consent statement contained on that form, Defendant signed the waiver on the Advice of Rights form and verbally acknowledged that he understood his rights before SA Meyers began actually interviewing Defendant. (Id. at 3:00–4:30; Gov't Ex. 1).

The signing of such a form "carries a significant weight in determining whether [defendant's] waiver was knowing and intelligent." United States v. Gallardo, 495 F.3d 982, 991 (8th Cir. 2007) (citing North Carolina v. Butler, 441 U.S. 369, 373 (1979)). The weight to be given to Defendant signing this Advice of Rights form is bolstered by the fact that SA Meyers read aloud the rights warning on the form to Defendant before handing him the form (Gov't Ex. 2 2:55–3:30), and as already indicated, that Defendant not only signed the waiver on the form but verbally acknowledged that he understood his rights before answering any questions. (Id. at 3:00–3:40).

Furthermore, at the Motions Hearing, SA Meyers offered testimony that Defendant, at the time of the interview, responded appropriately to questions presented. (January 15, 2019, Motions

Hearing, Digital Recording at 12:49–12:50 p.m.). SA Meyers' testimony that Defendant responded appropriately to questions presented is corroborated by the Court's review of the audio recording (Ex. 2) of the interview of Defendant.

At the motions hearing, Defendant also argued for the first time that Defendant's August 15, 2018, statements should be suppressed because he was not brought before a judicial officer within a reasonable time after his arrest. This argument, however, fails here.

Initially, this Court is presented with the question of whether the timing of Defendant's presentment is governed by the Federal Rules of Criminal Procedure or the rules of the Red Lake Tribal Court System. The Eighth Circuit definitively answered this question in Grooms v. United States, 429 F.2d 839 (8th Cir. 1970), affirmed that answer in United States v. Morris, 445 F.2d 1233 (8th Cir. 1971), and recently re-affirmed that answer in United States v. Jeanetta, 533 F.3d 651 (8th Cir. 2008), and the answer is that federal law does not govern:

> The requirements of [Rule 5(a)] and the teachings of the Supreme Court in McNabb v. United States, 318 U.S. 332 (1943) and Mallory v. United States, 354 U.S. 449 (1957) are designed to frustrate law-enforcing officers from detaining the arrested person for an unnecessary period of time to enable the officer to extract a confession from the arrested individual. But this salutary principle is not applicable where the person under arrest is in the custody and under the control of local and not federal officers, unless, of course, the state officers are acting at the direction of or in concert with the federal officers, or there is collaboration between the federal and state authorities. See Grooms v. United States, 429 F.2d 839, 842–843 (8th Cir. 1970), and the numerous cases there cited.

United States v. Morris, 445 F.2d 1233, 1236 (8th Cir. 1971) (emphasis added). In Jeanetta, for example, the defendant was arrested, taken into, and held in state custody until he entered a plea of guilty to the outstanding state charges. Jeanetta, 533 F.3d at 655. Upon pleading guilty, the defendant was released into federal custody and arraigned the next day. Id. The Court, however, found that because the defendant was in state custody the entire time, the protections of Federal Rule 5(a) were not implicated and thus there was no violation of Federal Rule 5(a). Id.

In the present case, as in <u>Jeanetta</u>, Defendant was in the custody of Red Lake Tribal authorities, a separate and distinct sovereign, during the entire 5 day period of time relevant to this Motion; he was <u>not</u> in the custody of the Federal government. Additionally, while SA Meyers was present at the crime scene on August 10, 2018, and interviewed Defendant on August 15, 2018, there is no evidence in the record to suggest that Defendant was then being held by the Red Lake Tribe at the direction of, or in concert with, any Federal officers, including SA Meyers. Therefore, under the plain language of <u>Morris</u>, re-affirmed in <u>Jeanetta</u>, Fed. R. Crim. P. 5(a) and the U.S. Supreme Court interpretation of that Rule are inapplicable in the present case. Furthermore, there in nothing in the record to show or even suggest that the Red Lake officers violated their own tribal policies or procedures by not presenting Defendant to a tribal judge within a certain period of time as of August 15, 2018.

Thus, under the totality of the circumstances, the Court concludes that Defendant's waiver of his rights before the August 15, 2018, interview was also knowingly and intelligently made.

Accordingly, because Defendant voluntarily, knowingly, and intelligently waived his <u>Miranda</u> rights before being subject to custodial interrogation by SA Meyers on August 15, 2018, the Court recommends **DENYING** Defendant's Motion to Suppress Statements, Admission, and Answers, [Docket No. 31], to the extent the motion pertains to the statements Defendant made in his August 15, 2018, interview.

## III.    DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF SEARCH AND SEIZURE. [DOCKET NO. 32].

Defendant next argues that the evidence obtained as part of the outside search of Avis Laduke's property should be suppressed because Defendant had a reasonable expectation of privacy at the Laduke Residence and because Avis Laduke's consent to the officers' search was not voluntary. (Def. Mot., [Docket No. 32], at 2).

### A. Standard of Review

It is undisputed "that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." Alderman v. United States, 394 U.S. 165, 171–72 (1969); See, United States v. Salvucci, 448 U.S. 83, 86–87 (1980). "The defendant moving to suppress has the burden of proving a reasonable expectation of privacy in the area searched." United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994). The defendant may not rely on "positions the government has taken in the case" but must "present evidence of his standing, or at least . . . point to specific evidence in the record which the government presented [that] establishe[s] his standing." United States v. Maxwell, 778 F.3d 719, 732 (8th Cir. 2015) (citing United States v. Zermeno, 66 F.3d 1058, 1062 (9th Cir. 1995)). Whether the expectation is reasonable is a question of law. See, United States v. Kiser, 948 F.2d 418, 423 (8th Cir. 1991), cert. denied, 503 U.S. 983 (1992).

### B. Analysis

First, to the extent that Defendant is attempting to challenge the search of the Laduke Residence, he lacks standing to do so.

In order to have standing to seek suppression of the fruits of an allegedly unconstitutional search of the Laduke Residence, Defendant must "prov[e] a reasonable expectation of privacy in" the Laduke Residence. See, Maxwell, 778 F.3d at 732 (8th Cir. 2015). Defendant bears the burden to make this showing, and he may not "rely on 'positions the government has taken in the case' but must 'present evidence of his standing, or at least . . . point to specific evidence in the record which the government presented [that] establishe[s] his standing.'" See, Id.

In the present case, there is no evidence in the present record to suggest that Defendant had any reasonable expectation of privacy in the Laduke Residence. Rather, at the motions hearing, CI Pierre testified that when he entered the home, he was aware the residence was owned by Avis Laduke and that he did not observe anything which would indicate that Defendant lived at the residence. (January 15, 2019, Motions Hearing, Digital Recording at 12:23–12:25 p.m.). "A casual visitor does not have an expectation of privacy[.]" United States v. Heying, No. 14-cr-30 (JRT/SER), 2014 WL 5461988, *17 (D. Minn. Aug. 15, 2014) (citing United States v. Perez, 700 F.2d 1232, 1236 (8th Cir. 1983)). Here, there is nothing in the record to indicate that Defendant was even an overnight guest at the Laduke Residence such that he could have had a reasonable expectation of privacy at the Laduke Residence. See, gen., Minnesota v. Olson, 495 U.S. 91, 96 (1990). Accordingly, Defendant has failed to meet his burden to establish standing to challenge any search of the Laduke Residence.

Therefore, on the record before the Court, there is no evidence to support that Defendant has standing to challenge the search of Avis Laduke's home. See, United States v. Davis, 361 Fed. App. 704, 705–06 (8th Cir. 2010) (unpublished opinion) (holding that defendant lacked standing to challenge the search warrant authorizing the search of his uncle's home when "[t]he evidence did not show that [he] either lived or stayed more than irregularly at his uncle's residence, that he stored personal effects there which he admitted to owning, or that he had exclusive access to or had taken precautions to maintain privacy in . . . the room where the [evidence] was found").

Accordingly, because Defendant has not presented any evidence of his reasonable expectation of privacy in the Laduke Residence, nor pointed to any specific evidence presented by the Government that would otherwise establish his reasonable expectation of privacy in the Laduke Residence, the Court finds that Defendant did not have a reasonable expectation of privacy at the

Laduke Residence. Therefore, the Court further finds that Defendant does not have standing to challenge the search of the Laduke Residence.

Furthermore, under the emergency doctrine, the officers' entry into, and their subsequent search of the outside the Laduke Residence, was in any event constitutionally justified. "Exigent circumstances may provide a basis for a warrantless entry." United States v. Clement, 854 F.2d 1116, 1119 (8th Cir. 1988). "One exigent circumstance that may justify entry without a warrant is when the police 'reasonably believe that a person within is in need of immediate aid.'" United States v. Selberg, 630 F.2d 1292, 1295 (8th Cir. 1980) (quoting Mincey v. Arizona, 437 U.S. 385, 392 (1978)); Mincey, 437 U.S. at 392 ("We do not question the right of the police to respond to emergency situations."); See also, United States v. Cervantes, 219 F.3d 882, 889 (9th Cir. 2000) (finding justification for adopting the emergency doctrine . . . "in [police officers'] community caretaking function to respond to emergency situations" (citation omitted)).

In the present case, the officers had a reasonable belief to not only initially respond to and enter the Laduke property but also to remain as there was an indication of more than one person at the Laduke Residence that was a stabbing victim in need of immediate medical assistance. Specifically, the officers were responding to a "911" call regarding a stabbing. While at the scene, the officers were informed by the owner of the Laduke Residence, Avis Laduke, that a second stabbing victim remained inside the Laduke Residence. (January 15, 2019, Motions Hearing, Digital Recording at 11:43–11:44 a.m.).[5] Avis Laduke's statement was further corroborated by the fact that when Sgt. Kingbird first arrived at the crime scene, Defendant told him that he had stabbed

---

[5] While Avis Laduke did not initially consent to the officers' entering her home, she later consented to the officers checking the stabbing victim, her son Robert McGregor. (January 15, 2019, Motions Hearing, Digital Recording at 11:43–11:44 a.m.). When the officers located Robert McGregor inside the Laduke Residence, he was injured and required medical care. (Id.).

more than one person, as well as, the fact that the officers had only seen one person initially transported from the Laduke Residence in an ambulance. (Id. at 11:30–11:31 a.m.).

Thus, under such circumstances, it was entirely reasonable for the officers to be on the curtilage of the Laduke Residence and enter the Laduke Residence to check on Robert McGregor. See, Mincey, 437 U.S. at 392–393; See also, United States v. Haley, 581 F.2d 723, 724–26 (8th Cir. 1978) (concluding that where the officer observed defendant lying on the street and reasonably believed defendant was in need of immediate assistance but could not find any identification on defendant's person, the officer's search of defendant's briefcase for identification was justified by exigent circumstances).

Therefore, assuming that the officers' act of entering the curtilage and going inside the Laduke Residence constituted a search, exigent circumstances justified this warrantless entry and thus anything seen by the officers, as well as, the shirt seized from the porch of the Laduke Residence and the shirt that was voluntarily given to the officers by Andrea Laduke, were lawfully seized under the plain view doctrine. Mincey, 437 U.S. at 393 ("[T]he police may seize any evidence that is in plain view during the course of their legitimate emergency activities."); Hatten, 68 F.3d at 261 (recognizing that "[h]idden guns, even badly hidden guns, are by their nature incriminating," and concluding that the warrantless seizure of a gun from defendant's car was justified under the plain view doctrine).

Lastly, assuming that the officers' act of going inside the Laduke Residence and later processing the curtilage crime scene constituted a search of the Laduke Residence and the surrounding curtilage, such actions were valid because Avis Laduke—the owner of the Laduke Residence—voluntarily consented to the search by the officers. While there was evidence that Avis Laduke may have been intoxicated, it was clear to officers at the scene that she was still in

control of her faculties, and thus, her consent to the officers' search was voluntary. United States v. Contreras, 372 F.3d 974, 977 (8th Cir. 2004) (holding that the defendant's consent to a search of his home was voluntary where he appeared in control of his faculties at the time he consented even though he used methamphetamine the evening before and marijuana the day he gave consent). Avis Laduke's control of her faculties is evidenced by the fact that she was generally appropriately responsive and interactive with the officers. See, gen., United States v Contreras, 372 F.3d 974, 977 (8th Cir. 2004) (finding that the defendant's consent to the search of his home was voluntary where the defendant was lucid and understood the questions being asked of him). Thus, Avis Laduke's actions of ultimately letting the officers inside her house to check on her son's stabbing injuries, as well as, not objecting to the officers photographing her porch and surrounding yard, sufficiently show that Avis Laduke consented to the officers' search of her home. See, United States v. Flores, 474 F.3d 1100, 1104 (8th Cir. 2007) (finding that a defendant voluntarily gave consent to a search where the defendant consented to the search after brief questioning and did not object to the search once it commenced).

Accordingly, because Defendant does not have standing to challenge the search of the Laduke Residence, because the officers entered the Laduke Residence to check on an injured person pursuant to the emergency doctrine, and because the officers obtained the consent of the homeowner Avis Laduke, the Court recommends **DENYING** Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure. [Docket No. 32].

## IV.    CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.    Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 31], be **DENIED**; and

2.    Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 32], be **DENIED**.

Dated: February 7, 2019                              s/Leo I. Brisbois
                                                     Leo I. Brisbois
                                                     U.S. MAGISTRATE JUDGE

# N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.